1829.

THE PUBLIC ADMINISTRATOR OF NEW YORK *v.* WATTS
AND LE ROY.—J. L. NORTON *v.* THE SAME.

A testamentary paper, purporting to be a will of real and personal estate, was prepared by the testator, in his own handwriting, with an attestation clause and leaving blanks for the date, and upon his death, twenty-seven years afterwards, it was found among his valuable papers in this state, without subscribing witnesses, date or signature; held, that it was an unexecuted and unfinished instrument, and was not a valid will of personal estate.

Where, from an inspection of a testamentary paper, or otherwise, it appears that the deceased intended the same to operate as his will, without any further act on his part, and without the addition of any other formalities, it is a valid will of personal property.

[*348]

But if some other act or formality was supposed necessary by the testator, or was intended to be done and observed by him, it is an unfinished or unexecuted *will, and is not valid unless the testator was arrested by death before he had reasonable time to complete his will in the manner intended.

Where a person appears before a surrogate to oppose probate of a will, he is bound, if required by the adverse party, to propound his interest, or show his right to contest the will.[1]

If issue is taken on the allegation of interest, the evidence in relation to that question and that which relates to the validity of the will should proceed *pari passu.*

A person claiming as next of kin should in his allegation of interest show how he was related to the deceased.

An allegation, by a party coming to contest a will, that he is nearer of kin to the deceased than any other person residing in the United States, is not sufficient.

THIS was an appeal from the decree of the surrogate of the city and county of New York, establishing an unexecuted paper propounded by the respondents as the will of John G. Leake. The father of the decedant was a British officer, who came to this country about sixty years since, with his two sons, Robert W. and John G., and died in the city of New York, in 1774. He had one daughter, who died before her father, and without issue. Robert W. mar-

[1] See 2 R. S. (4th ed.) 244.

ried the sister of John Watts, the respondent, and died in 1788, leaving his wife and one child him surviving. The child died a few years afterwards, but the widow is still living in England. The decedent studied law as a profession, and practiced for a number of years in the city of New York. He was never married, and during the latter part of his life, although he kept house, yet he had no family except two colored domestics. He lived like a hermit, seeing no company, and seldom leaving his house. He died in June, 1827, between seventy and eighty years of age, leaving a personal estate estimated at about $250,000, and a real estate nearly as large. He had become much enfeebled by age, and had been more unwell than usual for several days before his death, but retained his senses to the last. After his decease, the instrument propounded was found in an iron chest where he had for many years been in the habit of keeping his valuable papers. It was written on a large sheet of conveyancing paper, but neither enclosed or indorsed, and was found lying between the leaves of a field book made in 1802, but in which some memorandums had been made as late as 1806. The will was in *the handwriting of the testator, was carefully written throughout, and was as follows:

"In the name of God, amen. I, John G. Leake, of the city of New York, make this my last will and testament, humbly hoping for eternal happiness through the mercy of God and the mediation of my Saviour. I hereby nominate, constitute and appoint my friends, Robert Watts, John Watts, Herman Le Roy and William Bayard, all of this city, and the survivors and survivor of them, executors and trustees of this my last will, and for the care and trouble they will have in executing of the same, and as a mark of my sincere esteem and regard, I give and bequeath unto each of them one thousand dollars. After paying my just debts and funeral expenses, I give and bequeath unto the rector and inhabitants of the Protestant Episcopal Church in this city, for the use of their charity school, one thousand

VOL. I.                25

*Margin notes:*

1829

The Public Administrator
v.
Watts and Le Roy.

Norton
v.
The Same.

[*349]

1829.

The Public
Administrator
v.
Watts and Le
Roy

Norton
v.
The Same.

dollars; unto Margaret Leake, relict of my late brother Robert Leake, I give and bequeath my plate, best household linen, and such jewels as belonged to my late mother in law. I give and bequeath unto Susannah Barker, late Susannah Richards, god-daughter of my, said mother in law, all my estate and interest in a lease from the governors of the college in this city to Robert Ross, (assigned to me by said Ross,) of two lots of ground in Greenwich street. I give my black man James his freedom and one hundred dollars; for the last time enjoining upon him a reformation of conduct, without which freedom will prove his greatest punishment. All the rest, residue and remainder of my estates, real and personal, I give, devise and bequeath unto my said executors, the survivors and survivor of them, for the uses and upon the trusts following, viz.: As for and concerning my estate and interest in the town ship of Hyde, ———— county, which I declare to be held by me in trust for Benjamin Hugget, formerly of this city, now deceased, and his heirs, that they convey the same on demand to the legal heirs or devisees of the said Benjamin Hugget or to whomsoever the said heirs or devisees shall legally nominate and appoint to take and receive the same, first paying to my executors all moneys which I may or shall have *advanced on account of said estate. And as for and concerning all such lands, for the sale whereof I may have entered into contracts or agreements, either personally or through Jedediah Sanger, Esq., of Whitestown, that they convey the same on receipt of the consideration money, conformably to the said contracts or agreements. And as for and concerning the shares in the bank of the United States which I shall leave at my decease, that they pay the interest or dividends arising therefrom, as the same shall be received, unto the aforesaid Margaret Leake; and in case of the non-renewal of the charter, the interest arising from the net proceeds thereof during her life. And as for and concerning all the rest, residue and remainder of my estates, real and personal, not hereinbefore disposed of,

[*350]

and all moneys arising from the sale or sales of my lands by virtue of any contract or agreement as aforesaid, and also the said bank shares, or the net proceeds thereof, on the decease of the said Margaret Leake, to and for the use, benefit and behoof of Robert Watts, the second son of my friend and executor John Watts, and his heirs, upon this express condition, that the said Robert Watts and his heirs shall and do take the name of Leake, and by that surname be called and known forever thereafter; and until the said Robert shall arrive at legal age, I give my said executors and trustees full power to lease, sell and dispose of, in fee or otherwise, any part or parts of my new lands, if they shall judge it for the advantage of the estate. But if the said Robert Watts shall die under age, and without lawful issue, or shall refuse to accept of this devise and bequest on the aforesaid condition, then it is my will, and I hereby order and direct that the said bank shares, upon either of the last mentioned contingencies taking place, and at the said Margaret Leake's decease, or the net proceeds thereof, in case of the non-renewal of the charter, shall be equally divided amongst the oldest surviving sons of my said executors, and that all the rest, residue and remainder of my estate real and personal in the hands and possession of my said executors and trustees upon the death or refusal of the said Robert Watts to accept as aforesaid, shall be likewise immediately thereupon conveyed and transferred by my said executors and trustees, the survivors *and survivor of them, unto the rector and church wardens of the Protestant Episcopal Church, the presiding or eldest minister of the Dutch and Presbyterian congregations respectively in this city, and their successors, together with the mayor and recorder of the said city, and their successors, upon this special trust and confidence, to be by them appropriated to the purchasing and endowing of a house, or of ground to erect and endow a building in the suburbs of the city, for the reception, maintenance and education from time to time forever thereafter of as many helpless orphan children,

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

[*351]

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

(paying no regard to the country or religious persuasion of their deceased parents,) until they shall severally arrive at an age to be put out apprentices to trades or services, as the said trustees shall deem the annual income arising from said estates fully adequate to support; and to be under such rules and regulations, with such and as many attendants for the management and government thereof as a majority of said trustees shall judge to be most useful and expedient; nevertheless, it is my will that no part of the estates devised shall be applied towards the purchasing or erecting of the building aforesaid, but that the expense shall be defrayed solely out of the rents, issues and profits. And I hereby give unto the said trustees full power to lease for a term of years, and to sell and dispose of in fee, or otherwise, for the best price and consideration that can be had or gotten for the same, any part or parts of the said real estate, and good and sufficient deeds and conveyances in the law thereupon to make, seal and deliver; placing all moneys accruing from such sale or sales at interest on the best and most permanent security for the better support and extension of the charity. I hereby revoke all former wills by me at any time heretofore made, and declare these presents only to be and contain my last will and testament. In witness whereof, I have hereunto set my hand and seal the —— day of ——, one thousand eight hundred. [L. S.]

"Signed, sealed, published and declared by the testator, as, for and to contain his last will and testament, in the presence of us, who at his request, in his presence and that of each other, subscribed our names as witnesses thereto."

[*352]          *No formal allegation of facts to support the paper propounded, was put in before the surrogate; but probate thereof was opposed by the public administrator of the city of New York, who claimed the administration of the estate of the deceased, on the ground that he died intestate, and without leaving any relatives. John L. Norton also opposed the probate, and claimed administration as the next of kin. His allegation of interest was as follows: "Your

petitioner has been informed and believes that John G. Leake, late of the city of New York, deceased, and who died in the said city, on the second day of June last, has repeatedly declared and admitted to others, that he was related to your petitioner. And your petitioner, confiding in the truth of the said representations, does verily believe that he is nearer of kin to the said John G. Leake than any other person now residing in the United States of America, and that he is legally and justly entitled to the administration of the estate of the said John G. Leake, and his next of kin." The respondents objected to this, as an insufficient allegation of his interest; but the surrogate decided, it was sufficient to authorize him to be heard in opposition to the will. After hearing the proofs of the respective parties, the surrogate pronounced in favor of the will; and Norton, and the public administrator, both appealed to this court from the decree of the surrogate. The following is the opinion of the surrogate, delivered in support of the will: ·

*J. Campbell,* Surrogate:—The present subject of controversy has been submitted to me by the parties, without argument, after a laborious and protracted investigation. The important question of law to which it gives rise, and the vast amount of property involved in its issue, renders it a case of extraordinary interest; and in proceeding to decide it, I am only encouraged by the reflection, that should the judgment that I am about to render prove erroneous, it may be easily corrected by an appeal to a higher and more competent forum. It happens fortunately that the case is not embarrassed by any preliminary difficulties; there are no contending papers to be disposed of, and no doubts are entertained with *respect either to the handwriting or the mental capacity of the deceased.

Mr. John G. Leake, an aged and respectable inhabitant of this city, recently died, without leaving any relatives that have yet been satisfactorily ascertained. on whom his

*1829.*

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

[*353]

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

estate would legally devolve. He was born in England; and when about the age of fifteen, he came to this country, near sixty years since, in company with his father and brother. Soon after his arrival, he commenced the study of law in the office of James Duane, then a practicing and eminent lawyer in this city; and here his intimacy with Mr. John Watts, who was a fellow student in the same office, commenced; an intimacy that afterwards ripened into friendship, and which continued without interruption to the period of his death. The father, Robert Leake, was a commissary-general in the British army: he died in this city about the beginning of the year 1774, having had three children, Ann Margaretta, Robert William and John George, the deceased, who were the issue of his first marriage; by his second wife, whom he married in this country, he had no children. Ann Margaretta remained in England; she married a Mr. William Fenwick and died a short time before her father, without issue.

The brother, Robert William, held the commission of a major in the British army. After the American revolution, he returned to England, where he died some time in the year 1788. He married a sister of Mr. John Watt; she still survives, and, is now residing at Southampton in England. By this marriage there was one child, a son, who died at the early age of eight, in the year 1793. His premature death was long and deeply lamented by the deceased, and there is good reason to believe, had his life been prolonged to the present day, he would have been the sole and undisputed heir of this estate. For his sister in law in England, he appears to have cherished a constant and sincere affection; she stood in need of assistance, in consequence of some severe losses which she had sustained, and it is in proof that he relieved her wants, by furnishing her from time to time with pecuniary aid. The deceased [*354] was never married; his mode of life was *recluse and solitary, never visiting, and seldom visited; having but few acquaintances, and still fewer associates; in his latter years

he was almost forgotten. He was intelligent and fond of conversing, but in his communications in relation to his estate, he is represented by all to have been fastidiously close and reserved. Perhaps the most he was ever known to disclose on the subject, was in the casual declaration he once made to Mr. Philip Brasher, that he intended the bulk of his estate should remain in this country.

In a closet or pantry adjoining his sitting room, and communicating with it by a door, stood an iron chest, of small dimensions, which contained his valuable papers. family jewels, and money for immediate domestic use. This chest was always kept locked, and the key of it was carefully retained by the deceased himself. His unimportant and obsolete papers were placed in common trunks, that lay in the second and third stories of the house. To the iron chest, the deceased had frequent occasion to repair; indeed, hardly a day passed, without his opening it for some purpose or another. Often his table would be covered with papers, taken out by himself, and if any of them had been opened, he would carefully fold them up before he replaced them. The papers in this chest were generally indorsed on the outside, and in their disposition and arrangement, he appears to have been extremely exact and methodical. About two weeks previous to his dissolution, the deceased being quite feeble and infirm, visited the iron chest for the last time. He was supported in going to it from his bed room up stairs, by his trusty and intelligent servant Abraham Casey, who unlocked the chest for him, and retired. Here he remained some time alone, and when the witness returned in order to reconduct him to his chamber, he observed that the deceased had something under his arm, which was entirely concealed from view under his morning gown. There is good reason, however, to conclude, that it was a parcel or bundle of papers; because when the witness again entered the room, he discovered from the cinders in the grate, that during his absence, the deceased had been engaged in burning papers.

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

*Immediately after his decease, the iron chest was opened in the presence of several respectable citizens; and in it was found, in a thin land-book, which lay about one-third the way towards the bottom of the chest, the paper propounded, enclosed in a blank envelope.

In the position in which this book lay in the chest, it could not have been seen without first removing some papers that covered it. The paper is a large sheet, and the one in which it was found enclosed is of a similar size. When it was written, cannot at the present time be accurately determined; the words "one thousand eight hundred" are written out at length; the day, month and the year are left blanks; but from evidence derived from the instrument itself, it was probably written many years back.

The paper discovered in the manner related, is a long, full and formal will, written throughout in the handwriting of the deceased, without erasures or alteration; in all its parts perfect, and wanting nothing to render it for every purpose effectual, but his signature and the usual attestation of subscribing witnesses.

By this paper the deceased, after, among other things, bequeathing to his sister in law Mrs. Margaret Leake, his plate, household linen, and the jewels of his deceased step-mother, and making in addition a provision for her support during her life, devises and bequeaths all his residuary estate, both real and personal, to Robert Watts, the son of his friend Mr. John Watts, on condition of his assuming the surname of Leake, and that he and his heirs be forever called and known by that name.

The paper thus unexecuted, though acknowledged to be void as to the real, has been propounded by the surviving executors named in it, as containing a good and valid disposition of the personal estate.

The right of devising real estate did not originally exist at common law. This power was first given by the statute of Henry the 8th, denominated the statute of wills; and long after this period, in the reign of Charles the 2d, the

statute of frauds was enacted, which prescribed the formalities with which wills must be executed, in order to pass real estate. *Previous to the last-mentioned statute, a disposition by testament, of personal estate, was good without the signature of the testator, or any solemnity of publication. The statute of frauds made no alteration in this respect, and with the exception of some regulations in regard to nuncupative wills, the common law in relation to the disposition of personal estate by will remains unchanged.

The cases in the books are numerous, where loose and informal papers, without date or signature, have been held to be entitled to probate.

In papers of this description, the final disposing intention is principally regarded; and where this is satisfactorily ascertained, I am not aware that any cases exist where they have been rejected. (Swinburne, part 7, sect. 12. Same, part 1, sect. 2, page 6, and the cases there cited. Shepherd's Touchstone, 409. Chancery Cases, 273. 28 Car. 2, and the cases in Phillimore and Adams' Reports.)

The courts of this state furnish no cases that directly bear on the one under consideration. All the decisions having relation to the present matter in controversy are derived from England, and may be divided into two classes, the ancient and modern. The former constitutes a series which extends from the time of Queen Elizabeth to the era of our revolution; the latter embraces those that have subsequently occurred. Under the authority of the ancient cases, the testamentary validity of the present paper would not admit of much doubt; but according to the modern, its claims to this character do not appear quite so certain. By the constitution of this state, sec. XIII, art. 7th, only such parts of the common law as formed the law of the colony of New York, on the 19th of April, 1775, are recognized as law in this state: of course the decisions of English tribunals since that period, however much entitled to respect as mere opinions, are not obligatory here as legal authorities; but assuming that they were, I am inclined to

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

think that this paper may be established as a will, even on the principles advanced by those decisions.

Agreeably to the later determinations at doctors commons, there are two circumstances unfavorable to this paper; *the one is the addition of the attestation clause, the other is the length of time it was suffered to remain unexecuted. If personal estate only were bequeathed by this paper, there would have been more weight in the first objection; but as the deceased was also possessed of real estate, the future execution of it, in order to pass the latter, implies, I apprehend, no want of the *animus testandi* with respect to the former: on the contrary, it seems to be perfectly consistent with it. Independent, however, of this circumstance, the addition of an attestation clause is regarded as a circumstance in the highest decree equivocal, and it has been repeatedly decided, that it creates but a slight presumption against the validity of any testamentary paper. (*Harris* v. *Bedford*, 2 Phillimore's Rep. 177; *Beatty* v. *Beatty*, 1 Adams' Rep. 154; *Doker* v. *Goff*, 2 Adams, 42.)

In duly estimating the force of the second objection, arising from time, it must be remembered that the instrument in question is an unexecuted will, and is carefully to be distinguished from one which is both unexecuted and unfinished. It is written in a fair legible hand, and, in all probability, was engrossed from a draught, from the fact of its being entirely free from all erasures, interlineations and obliterations. In addition to all this, it is drawn out with professional skill and precision; and bears evident marks throughout of being a work requiring much time, labor and reflection, before it was brought to its present state of maturity. Whether the paper be unfinished or unexecuted, the presumption of law, it is alleged, is against either; but in the latter case it is slight, and may be rebutted by extrinsic evidence. (*Mortifiore* v. *Mortifiore*, 2 Adams, 354.)

Where a testamentary paper is unfinished, or merely in progress towards completion, nothing excuses its immediate execution, but inevitable necessity, or the act of God.

(*Sandford* v. *Vaughan and others*, 1 Phillimore, 39.) But if the paper be perfect in every other respect, except in being executed, the same strictness is not exacted, and a much greater latitude is allowed; nor have I, in the course of my researches, ever met with a case, either ancient or modern, where *length of time by itself has been held sufficient to reject a paper of this description. On referring to the cases in which unexecuted wills have been refused to be established, I believe it will be found, that in addition to the consideration of time, evidence has been admitted to induce a belief, either that they were never intended as final testamentary dispositions; that they were only preparatory to something further, or else that they have been subsequently abandoned.

Having briefly noticed the legal presumption existing against the paper, on the authority of the modern adjudications, it remains to be seen whether they have not been successfully repelled by the testimony which has been adduced in the course of the investigation.

It sufficiently appears from the proof, that the deceased was a person of singular manners, of indolent habits, and of a procrastinating disposition. An extreme aversion to communicate any thing respecting his private affairs, even to those with whom he was most intimate, was a conspicuous trait in his character; nor is it at all improbable that it was the influence of this feeling that prompted him to write and copy his will himself, and which afterwards restrained him from executing it in proper legal form.

The presumption against this instrument from lapse of time is, in my opinion, successfully repelled by the fact of its careful preservation, for a long period, among his valuable papers. Unless it was in the contemplation of the deceased that the paper should have a testamentary effect, the keeping of it in the manner that has been related, can only be accounted for on the supposition, either that he had entirely forgotten it, or that he considered it would be inoperative, from the circumstance of its not being and

1829.

The Public Administrator v. Watts and Le Roy.

Norton v. The Same.

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

acknowledged in the presence of witnesses. Granting, for
the sake of argument, that it was forgotten, I do not per-
ceive how mere forgetfulness would invalidate it, if the
maker possessed the *animus testandi.* So far from having
any such effect, it is believed it would rather weaken the
objection founded on the circumstance of time. Be this,
however, as it may, I am satisfied that the paper was never
out of his recollection.

[*359]        *To write an instrument like the one in question, was an
extraordinary act for the deceased to perform: it was,
moreover, a work of great deliberation: and when super-
added to this, it is remembered that he was in the daily
habit of repairing to this chest, and that he was also fre-
quently in the practice of taking out from it papers, and of
afterwards replacing them, the conclusion is inevitable, that
the existence of this paper was never effaced from his
memory. Equally improbable is the hypothesis that he
neglected to destroy it, from a confidence that it could never
have any operation as a will, by reason of its not being
executed. It is irreconcilable with his known and acknow-
ledged character for caution and prudence, to believe for a
moment, that he would run the hazard of leaving behind
him an important document such as this, under a loose and
vague impression that it would have no testamentary effect.
Let it be recollected, too, that he was a lawyer by profes-
sion; he was not, therefore, *inops consilii,* and it is fair to
presume, from his own readings and experience, that he
must have known of instances where papers, much less for-
mal, had been admitted to probate.

As a proof of his careful and vigilant disposition, a few
days previous to his death he goes to the iron chest, in order
to search among his papers; nor does he stop here; he is
observed to take out some, which he afterwards burns. If
he were apprised of the existence of this paper on this
occasion, (and that he was, I think the circumstances pre-
viously detailed justify the belief,) does not the omission to
destroy it almost amount to its recognition? Even on the

supposition that he considered it as a useless and unimportant paper, would it not have occurred to a man of his habitual caution and prudence, that it might hereafter produce trouble, and that it would be the safest course not to leave it behind? Had no other reasons existed, I believe a sense of propriety, and the respect which he entertained for his friend, Mr. John Watts, would have determined him to have committed this particular paper to the fire, at the same time that he consigned the others to that element.

Another circumstance in favor of this instrument, and in my opinion a pretty strong one, are the bequests contained *in it to his sister in law, Mrs. Margaret Leake. A letter has been produced in evidence, bearing date the 26th November, 1822, from the deceased to Mr. John Watts, when in England, from which I make the following extract, and which, whilst it strongly expresses his attachment to that lady, displays in a striking manner the character and feelings of the writer:

"Now for your hint: if two, three or four hundred dollars will add to the comfort of our sister, you shall remit it annually with her other stipend. Offer my affectionate regards, and say that I stand self-condemned for not acknowledging her repeated favors, and cannot promise amendment; for such is my want of spirits and indolent habits, a pen is to me a torpedo."

This lady, it will be observed, he calls by the fond and endearing name of sister. She had received decided proofs of his brotherly love and kindness in his lifetime, and from the paper in dispute, it would seem that it was far from being his wish that she should be left unprovided or destitute after his decease. The voluntary proffer on his part to remit to her annually, and the fact of his actually doing so up to the time of his death, shows not only in what high estimation he held her, but is also evidence of a continuance of testamentary intention; because, had he died intestate, as they were no ways connected by the ties of consanguin-

1829.

The Public Administrator v. Watts and Le Roy.

Norton v. The Same.

[*360]

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

ity, she never could have derived the smallest benefit from his estate.

And may not the declaration in this paper, of his holding certain lands in trust for Benjamin Huggert and his heirs, have been another motive for preserving it? This trust appears to have been of a secret and confidential character. No memorial of it has been found among his other papers, and but for the existence of this instrument, it would, in all probability, have forever. remained unknown. The disposition the deceased has made of his estate in this paper corresponds with the declaration he made to Mr. Brasher, that the greater part of it would remain here; and it also accords with the expectation long entertained by those most intimate with him, that he would leave it in the family of Mr. John Watts.

[*361]       *It is further to be observed, that there was nothing in the situation of the deceased that could render an intestacy desirable; indeed, there were good reasons why he should have been anxious to avoid it. In the event of an intestacy, he must have known that his personal estate would go into our city treasury, to await the claim of remote relatives, if any such exist; a consequence this, which he surely could not have contemplated with any kind of complacency. Situated as he was, detached from society, alone and solitary, without wife or children, or any near kindred, it was a natural feeling that he should desire to have his name perpetuated, and where was it more probable that he would look for a person to take it, than to the son of his ancient friend and contemporary, Mr. John Watts?

These considerations in favor of this paper, I apprehend, are not impugned by any opposing facts or circumstances. Certainly little or no importance is to be attached to the declaration the deceased is represented to have made, that he had or would make a provision for his servant Casey, as a reward for his faithful services. Allowing that he was not misunderstood, it is well known that promises of this nature

are sometimes made, merely to avoid importunity, when there is no real or serious intention to perform them. It is sufficient that no paper has been found containing this provision, and that no evidence has been offered to induce a belief that any such ever existed.

My sentiments being favorable to the establishment of this paper as a will, it becomes unnecessary to express an opinion on the question, whether Mr. John L. Norton has succeeded in proving himself to be of kin to the deceased.

In conclusion, I pronounce for the paper propounded, and I further order that the letters of administration (*ad colligendum*) heretofore granted in this case to Silvanus Miller, Esq., be revoked.

*C. Baldwin*, for the appellant Norton:—This is not a will. It was drawn in 1800, and was not consummated. It was left in an unfinished state to be afterwards executed. To make a valid will, it is necessary the testator should, at the *time of its execution, have the *animus testandi*. A blank for the insertion of the day and the month is not alone of much importance in deciding upon the *animus testandi*. It is evidence, however, in this case, that the paper propounded as a will was only prepared for further consideration. It is in proof that the testator was very exact and particular in all his transactions. He was a lawyer by profession, and was acquainted with all the forms of executing wills. He drew Ann Leake's last will and testament. If he had intended this as a will, he would have signed it at the bottom in the usual manner. The cases on the subject of signing, only tend to show that a signing in the commencement of a will is good, where there is an attestation in the presence of witnesses. Where a will, as in this case, disposes of real as well as personal property, and it is void as to the real property, it is void as to the whole. A condition of the bequest to Robert Watts is, that he should change his name. There is conclusive evidence in this case that John G. Leake abandoned all intention of making a

*1829.*

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

[*362]

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

[*363]

will. He delayed until 1827, twenty-seven years, without executing this paper, or altering its provisions so as to conform it to the altered situation of his property, and the varied claims of his friends. A part of the executors named by him had died; and the remainder had become incompetent by age. If he had intended this paper to operate as a will, he would have appointed new executors. The legacies to Susanna Barker and his servant man, had lapsed by their death during his lifetime. The direction in this paper to the executors to convey the lands held in trust for Huggert, to his heirs, is no proof of any intention to devise, as there might be other evidence of the trust than that contained in this instrument; and the presumption is, that the trust became extinct by the lapse of time. The will has become inoperative as to the contracts of Sanger. The charter of the bank of the United States expired in 1811, and the testator received not only the dividends, but the whole of the stock itself, the income of which he gave by this proposed will to Mrs. Robert Leake. Her right therefore to the income was gone, and her interest cannot be urged as an argument in support of this paper as a will. The testator was a stranger to Robert *Watts. He was only the son of his friend John Watts. If the testator ever had the intention of making Robert Watts his heir, he must have abandoned it before his death. His property, both real and personal, increased to a great amount after he drew this paper. If he had intended it to operate as a will, he would have republished it, or have made a codicil in order to pass his after-acquired land. The neglect on his part to execute this will is an implied abandonment or revocation of it. The question is not now, what the testator intended to do, but what he has done. If he intended that his real as well as his personal estate should pass by this paper, it is a strong presumption that it was only a deliberative act, and that something further was intended by him to be done. The place where, and the circumstances under which this paper was found, show conclusively that it was

not the intention of the testator to leave it as his will. The iron chest in which it was deposited and kept, contained many useless papers. It was placed in a sheet of blank paper, upon which no indorsement was made by the testator, recognizing the enclosed paper as his will, which is customary. If the paper had been sealed up, and the testator had indorsed upon the wrapper that his will was enclosed, it would have been strong evidence of the testator's intention that it should operate as his will. But the circumstances of this case manifestly show that some further act was to be done by the testator, and that he intended at some subsequent time to complete what was then in an imperfect state. The counsel cited the following cases: *Scott* v. *Rhodes*, (1 Phil. 12 ;) *Rymes* v. *Clarkson*, (1 id. 34, 5, 6, 8 ;) *Devereux* v. *Bullock et al.*, (1 id. 60 ;) *Passmore* v. *Passmore*, (1 id. 216 ;) *Carstairs* v. *Pottle*, (2 id. 30;) *Harley* v. *Bagshaw*, (2 id. 48 ;) *Read* v. *Phillips*, 2 id. 122 ;) *Dickenson* v. *Dickenson*, (2 id. 173 ;) *Harris* v. *Bedford*, (2 id. 177 ;) *Nichols* v. *Nichols*, (2 id. 180 ;) *Huntington* v. *Huntington et al.*, (2 id. 213 ;) *Newell* v. *Weeks*, (2 id. 224;) *Sikes* v. *Snaith*, (2 id. 351; *Denny* v. *Barton & Rashleigh*, (2 id. 575 ;) *Satterthwaite* v. *Satterthwaite*, (3 id. 1 ;) *Thomas* v. *Wall*, (3 id. 23 ;) **Friswell* v. *Moore*, (3 id. 135;) *Buckle* v. *Buckle*, (3 id. 323 ;) *Ferricane* v. *Gayfere*, (3 id. 405 ;) *Bail* v. *Main*, (3 id. 505 ;) *Forbes* v. *Gordon*, (3 id. 614 ;) *Rose* v. *Moulsdale*, (1 Adams, 129, 134;) *Beatty* v. *Beatty*, (1 Adams, 154 ;) *Wigg* v. *Wigg*, (1 Atk. 383 ;) *Montefiore* v. *Montefiore et al.*, (2 Addams, 354;) *Matthews* v. *Warner*, (4 Ves. 186, 197, 209 ;) *Doker* v. *Goff*, (2 Addams, 42.) The allegation of the interest of Norton is sufficient.

*J. Platt* for the public administrator :—Norton was bound to establish, in like manner as in ejectment, his relationship to the deceased. The testimony shows that there was no relationship by blood.

It is undoubtedly true, that a will of personal estate may be good, although not published in the presence of wit-

1829.

The Public Administrator v. Watts and Le Roy.

Norton v. The Same.

[*364]

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

nesses. (Swinb. on Wills, pt. 1, sec. 3, p. 6. Rob. on Wills, 72, 93, 105, Am. ed.) And it is sufficient if a will be signed at the top only, if it be sealed at the bottom, and published and duly attested by witnesses. (*Semoyne* v. *Stanley*, Swinb. pt. 1, sec. 11; 1 Rob. on Wills, 94, 95, 107; Skinners' R. 227; *Right* v. *Price*, 1 Doug. R. 244; *Warneford* v. *Warneford*, 2 Strange, 764; *Smith* v. *Evans*, 1 Wil. 313.) In the time of Bracton, the signature of witnesses was required. (*Allen* v. *Hill*, Gilb. 260.) Nuncupative wills were good before the statute of frauds and perjuries; and since that statute, the attestation of witnesses is not necessary to the validity of wills of personal estate. (*Limbery* v. *Mason*, Com. R. 451; *Hyde* v. *Hyde*, 1 Eq. Cas. Ab. 409; 3 Rep. in Ch. 155; 1 Shep. Touch. 399, 408.) Unfinished papers have, in some cases, been established as wills where the testator was prevented from executing them by sudden death. (*Sandford* v. *Vaughan*, 1 Phil. 39; *Bone* v. *Spear*, id. 345; *Lavender & Churchhill* v. *Adams*, 1 Addams' R. 406.) But wherever the testator proposes alterations, it is evidence that the instrument he intends as his will is a deliberative act only, which is afterwards to be completed. (*Lavender* v. *Adams*, 1 Addams, 406.) A delay of two months in the execution of a will has been ruled to be sufficient evidence of an abandonment of the intention to make a will. (*Antrobus* v. *Nepean*, 1 Addams, 399; *Warburton* v. *Burrows*, id. 383.) And even where the neglect to complete a will is only nine days, the presumptions are against it. *(*Griffin* v. *Griffin*, in note to 4 Ves. jun. 197; Rob. on Wills, 175; *Coles* v. *Treco-think*, 9 Ves. 249; 1 Rob. on Wills, 176.) We have no testamentary law, except what is derived from the English books. The paper in question, propounded as a will, is imperfect, unfinished and unexecuted. It was prepared with a view to the relative situation of the property of the deceased, and the claims of his friends as they then existed. The day and month being blank, shows that the testator did not then intend to execute the will. The addition of

[*365]

an attestation clause is evidence of his intention that it should not go into effect without execution. The testator intended to devise his lands as well as to dispose of his personal estate; and yet he, as a lawyer, knew that this instrument could not accomplish his object. It is improbable that he intended to distinguish between his real and personal estate; to die intestate as to the one and not as to the other. Long before his death his circumstances changed, and some of the principal dispositions of his property became void. His property was large; and the thought cannot be indulged, that attached to it as he was, he would leave it to depend on this loose, unexecuted paper. He may not have seen or thought of it for twenty years. There are no circumstances in the case to account for the delay of its execution, if the *animus testandi* continued. It cannot be supposed that a man would remain of the same mind for twenty-seven years, unless all the circumstances continued the same. One month's delay to execute this instrument, would, according to all the authorities, be sufficient cause to reject it. There is no proof that the testator ever opened or looked at it since the year 1800. He might then have intended to make a will. But it cannot be presumed that he intended to make this particular disposition of his property. Both his real and personal estate have undergone material alterations since the will was drawn. The widow of Robert Leake is now left unprovided for. The bank stock out of which a provision was made for her was received by the testator fifteen years before his death. The testator never saw Robert Watts, the principal devisee named in this paper, after he was a *child. If Robert Watts had continued the principal object of the testator's bounty, is it possible the testator would not have seen him during all this time? The testator clearly must have abandoned the idea of making him his principal devisee, inasmuch as he had given up hopes of raising through him a family to perpetuate his name. No provision being made in this paper for the testator's faithful domestics, Casey and

1829.

The Public Administrator
v.
Watts and Le Roy.

Norton
v.
The Same.

[*366]·

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

the black woman, the slave to whom he had given a legacy having died a long time since, and the peculiar place in which this paper was found, give rise to strong presumptions against it. There is no evidence that the testator had a habit of procrastination. If he had, he never could have acquired half a million of dollars. The rule in reference to a sudden death's preventing the execution of a will, means a death while the act is *in fieri*, and before the testator had a reasonable time to execute the will. The deceased was old, misanthropic, and miserly. He was in doubt what disposition to make of his property; and died before he determined upon whom he should bestow it.

*S. A. Talcott*, for the respondent:—The allegation of interest by Norton is not sufficient to authorize the proponents of the will to put in a counter allegation. There is no evidence that Norton was a blood relation of the deceased. The will in question is perfect except as to the execution. The interest of the proceeds of the bank stock passed by the will to the widow of Robert Leake, notwithstanding the stock itself was paid to the testator. There is no improbability that the principal devisee named in the will, will yet raise up a family. At the time the testator drew the will he must have intended that it should take effect. A will may be perfect without being executed in presence of witnesses, although there be an attestation clause and a blank for the date. (Swinb. pt. 7, sec. 2, 12; Kilway, 209; Brownlowe, 44; S. C. Dyer, 72; Chan. Cas. 273.) If the testator intended the will should operate as to the personal property, although he never executed it so as to pass the real estate, it is good. If this instrument was a will of personal property, the true question is as to the *animus testandi*. (1 Serg. & Rawle, 263, per Tilgham,

[*367]

C. J.) Slight evidence is sufficient to rebut the *presumption arising from the attestation clause. It was perfectly natural for the deceased to give his property to the Watts family. John Watts was the friend of his youth. The

circumstances under which this will was found are in favor of its validity. It was in the handwriting of the testator. (*Scott* v. *Rhodes*, 1 Phil. 12, 17; Shep. Touch. 409; 1 Addams, 53, 164, 375, 456, 492; 2 Phil. 122; 2 Addams, 356.) Many persons postpone making a will from the belief that it is the precursor of death. The testator might have left the will unexecuted, in order to embrace all his after-acquired estate. It was found in a book not made until 1806. The testator told Brasher that he should leave the bulk of his property in this country. He could not have intended to die intestate, leaving his property to escheat, and his sister unprovided for. If this was his intention, why did he not destroy the will? The execution of the will might have been prevented by the act of God; and this by the ecclesiastical law means any extrinsic circumstance which prevented it. A habit of procrastination is considered the act of God. (*Allen* v. *Manning*, 2 Addams, 500; *Warburton* v. *Burrows*, 1 id. 383.) Lapse of time in executing a will is only evidence of an abandonment of the *animus testandi*. (**2** Addams, 358; *Scott* v. *Rhodes*, 1 Phil. 20.)

*J. V. Henry*, same side:—The will leaves nothing undisposed of. The bequest of the bank stock did not lapse by the expiration of the charter of the Bank of the United States and the payment of the stock to the testator. The statute of frauds, (1 R. L. 367, s. 16,) does not alter the common law. If this paper was once a good will, it could not have been altered, except by an instrument in writing. (Swinb. on Wills, 80, 81, and note.) Signature is not necessary at the bottom of the will. The testator was a lawyer, and well acquainted with the formalities of executing a will. He intended to keep the will unexecuted until the last moment, in order to pass all his real estate. The will is perfect as to the personal estate. (2 Black. Com. 501; 2 Swinb. 639, and notes; Toller, 2; Loveless, 154; *Butler* v. *Baker*, Co. 31; *Stephens* v. *Gerard*, Keble, 128; Swinb.

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

80, 81, and notes; 3 Com. Dig. tit. *Devise*, E. 1; Siderfin, *315, S. C.; *Rolph* v. *Hanley*, 1 Dyer, 336, 72 a; *Nash* v. *Edmunds*, 1 Cro. El. 100; 2 Keble, 345; *Peate* v. *Ougley*, Com. R. 199; *Powell* v. *Belstock*, 2 Ray. 1282; *Irish* v. *Pelham*, 2 Vernon, 647; *Beauchamp* v. *Earl of Hardwicke*, 5 Ves. 280; 1 Adams, 159; 2 id. 357, 46; 2 Phil. 177, 185, 173; *Greenough* v. *Martin*, 2 Adams, 243.)

THE CHANCELLOR:—The barrenness of our books on the subject of testamentary law has compelled me to bestow much labor upon the investigation of this case, and much time has been employed in obtaining those books which were necessary to be examined by me before I could, in justice to the parties in this cause, bring that investigation to a close. It is but a few years since any thing like regular reports of testamentary causes were attempted even in England, and in this state not more than half a dozen cases are to be found in the forty-six volumes of our own reports, and very few in the reports of our sister states. Before the revolution, the colonial governors claimed and exercised the prerogative of deciding all testamentary cases, upon the principles which governed the ecclesiastical courts in the mother country. Since that period, the same jurisdiction has been conferred upon the local surrogates, who have proceeded in such matters without much form or system. Although an appeal was given to the judge of probates, very few causes were brought before that court; and it is understood that even there nothing like regular rules of practice were ever adopted. The testamentary law of England, as it existed at the commencement of the revolution, was recognized by the first constitution as the law of this state, and very little alteration has been made in it since, except as to the tribunals in which it was to be administered. Devises of real estate, both here and in England, being regulated by statute, and the ecclesiastical courts there having the exclusive cognizance of wills of personal property, to ascertain what the law was before the

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

revolution, we are obliged to resort to the recent reports of adjudged cases in England since that time; to elementary writers; to the few cases brought before the superior courts of appeal, scattered through several hundred volumes of common law and Chancery reports, and to a small number of adjudged cases which took place after the statute of 32 Henry 8, allowing a devise of real estate, and before the statute of frauds and perjuries, (29 Car. 2, ch. 3,) which required wills of real estate to be executed in the presence of three witnesses.

The testamentary law of England was derived from the civil law, and was probably introduced into that country by the ecclesiastics and civilians who came thither with William the Conqueror, or soon after. By the civil law the will of an ordinary person might be in writing, or by parol; but in either case it was necessary to the validity of the testament, that seven witnesses should be present at the making thereof. (Domat, book 3, tit. 1, sec. 3.) Testaments of this description, however, are unknown to the law of England, and were never in use there. But the civil law being introduced into England at the time when the military system was at its height, another species of wills, authorized by the Roman law to be made by officers and soldiers of the army, called military testaments, was adopted, and applied to the testamentary dispositions of every person, whether he belonged to the army or otherwise. (Gilbert's Rep. 260.) This was at a time when, by the feudal system of military tenures, real property was not devisable.

No particular form was required for a military testament, but the testator might declare his will in such manner, as the conjuncture in which he happened to be enabled him to do it, provided his intention appeared by good proof. (Domat, book 3, tit. 1, sec. 2, art. 15.) Thus a military testament might be made orally by the testator's declaring his will in the presence of witnesses, which was called a nuncupative will; or it might be in the form of a written memorandum or declaration of his wishes respecting the

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

[*370]

disposition of his property after his death, written by his own hand and signed by him, or written by another and signed by the testator, or reduced to writing in the presence of witnesses, either by the testator or at his request. Domat after describing these several kinds of testaments, and objecting to the nuncupative will on account of the facilities it afforded for fraud, says, "The second kind of testament, written and *signed by the testator, or written by another hand and only signed by him, has not the same inconveniences in it; for the writing is a sort of authentic proof in its own nature, and which would be sufficient to oblige a person even beyond his estate. So, that if a military testament ought to be dispensed with as to the forms, it would seem to follow, from this principle, that it may be sufficient to observe therein a formality, which of its own nature is a perfect proof that he who writes and signs any act, wills and approves that which he has signed; and this is such a proof as suffices in many places for ordinary testaments."

Judge Blackstone, in his commentaries, (2 Bl. Com. 501,) says, "A testament of chattels written in the testator's own hand, though it has neither his name or seal to it, nor witnesses present at its publication, is good, provided sufficient proof can be had that it is his handwriting." For this he cites Godolphin's O. L. and Gilbert's Reports. And Loveless has copied this sentence from Blackstone without any explanation. (Lovel. on Wills, 160.) I have not been able to find the Orphan's Legacy; but on referring to Gilbert, the report does not warrant the broad language used by the learned commentator. The passage referred to is as follows; "Even since the statute, if the will be made of goods, and written in the party's own hand without any witnesses at all, it is allowed to be good; but it is not a nuncupative but a written will, and the statute does not require any witnesses to wills of chattels only." (Gilb. Rep. 260.) But from what immediately follows, it evidently could not have been the intention of the writer to declare such a will good, without being signed by the testator, or

some other evidence of the *animus testandi ;* for he adds,
"But there were many inconveniences found after this
statute of Hen. 8, (statute of wills,) for men would set up
papers that were not signed by the deceased, and would
get witnesses to swear to the publication of it; and this was
easily contrived and construed, since there were no solem-
nities required at the publication of it.   If any preparation
was made for a will, they would get witnesses, after the
decease of the party, to swear to the publication of it; and
often old dormant wills were set *up, and the latest wills
were smothered by such contrivances."   The writer of the
Touchstone, (supposed to have been Mr. Justice Doddridge,)
before the statute of frauds, also says, " A written testa-
ment, when it is written with the testator's own hand, doth
prove and approve itself, and therefore needs not the help
of witnesses to prove it; and for this cause, if a man's testa-
ment be written fair and perfect with his own hand, after
his death, albeit it be not subscribed with his name, sealed
with his seal, or have any witnesses to it, if it be known or
can be proved to be his hand, it is held to be a good testa-
ment and a sufficient proof of itself; but if it be sealed with
his seal and subscribed with the name of the testator, and
can be proved by witnesses, it is the more authentic."
(Shep. Touch. 408.)   But even there the succeeding remarks
of the writers show that other circumstances must be re-
sorted to in such cases to establish the *animus testandi.*

It was undoubtedly on the same principle upon which
formalities were dispensed with in favor of military persons
by the Roman law, the necessity of the case, that the Eng-
lish civilians, after the statute had required all wills to be
in writing, admitted instructions for a will or an unfinished
testamentary paper to probate, although the testator intend-
ed other solemnities should be observed before it operated
as a will, in cases where by sudden death he had not a
reasonable time to execute the will in the intended form.

This principle was applied to a will of lands, in *Browns'*
*case*, (Keilway, 209,) soon after the passage of the statute

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

[*371]

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

[*372]

32 Hen. 8, authorizing devises of real estate by will in writing, and before the act of the 29th Charles 2, which required such wills to be executed in the presence of three witnesses. The case was this: the testator being sick, sent for a scrivener to draw his will. When he arrived, he took down some notes of the will, as directed by the testator, and immediately went to his own house with the written notes, and drew out the will of the testator in form agreeably thereto, and finished it before 12 o'clock and went to the testator's house to deliver it to him; but on arriving there half an hour afterwards, he learned that the testator died at 12 o'clock; and in an action between the heir and devisee, it was held by all the justices *that it was a good will of real estate under the statute. This case is stated substantially in the same way by several cotemporary reporters. (Anderson's Rep. 34; Benl. & Dal. 61; 1 Dyer, 72.) The same principle is recognized in a note to *Griffin* v. *Palmer*, (Brownlow's Rep. 44;) and in the case of Hinton's will, made in the 2d year of Edward 6, decided in the court of wards in the reign of Queen Elizabeth, (1 Dyer, 72, b.) In *Stephens* v. *Gerrard*, decided in the 18th year of Charles 2, (1 Siderfin, 315; 2 Keble, 128,) where it was shown that Sir E. Worsley dictated a writing made by a third person, and caused it to be interlined, and said he intended to write it over again himself, but in the meantime it should be his will, but refused then to sign or publish it as such, and there was an attestation clause stating that he had put his hand and his seal to every sheet, but he had not done it to any, yet it was held a good will. And in *Dime* v. *Munday*, in the 20th Charles 2, in K. B., (2 Keble, 345; 1 Siderfin, 362, S. C.,) where the testator declared that the lessor of the plaintiff should have the premises in question, and the attending physician put it in writing, and the testator was asked if he approved it, and he said aye and sealed it, but did not subscribe his name thereto, it was held a good will, and the plaintiff recovered. So in the case of *Rolph* v. *Hampden*, which was before the statute 32

Hen. 8, (1 Dyer, 53 b,) a paper writing, without subscription or seal, proved by one of the witnesses thereto, was held a valid will of lands devisable before the statute of wills. It was in that case also holden that a will of lands need not be in writing. Wills of personal property, under the English statutes and our own, stand upon the same footing as devises of real estate did after the statute of wills and before the statute of frauds. These cases are therefore important to show what was the law of England as to wills of personal estate at the time of our revolution.

The importance of the principles involved in this case has induced me also to examine all the reported cases on the subject of informal, imperfect, unfinished or unexecuted wills of personal estate which have been decided in England since the statute of frauds. And with two or three exceptions, *which will be hereafter noticed, I find certain settled and uniform principles running through all the cases; or, at least, governing the decisions in those cases which are reported with sufficient accuracy to enable me to ascertain the grounds upon which the decisions took place. The distinction recognized in these decisions appears, to be between those cases where from the inspection of the testamentary paper, or from the positive testimony of witnesses, or circumstantial evidence, it satisfactorily appeared that the decedent intended the same to operate as his will, without any further act on his part, or the addition of any other formalities, and the cases where some other act or formality was supposed necessary was intended to be done or observed.

The first class of cases may be denominated imperfect or informal wills. They are to be carried into effect notwithstanding any lapse of time between the making of the same and the death of the testator, unless there is legal evidence of revocation, or the lapse of time, in connection with his acts and declarations, are sufficient to satisfy the court that the paper was deliberative only, and never was considered final by him.

[*373]

The Public
Administrator
v.
Watts and Le
Roy.

The Same.
v.
Norton

[*374]

The second class may properly be styled unexecuted or unfinished wills, in the progress of completion, and which the decedent intended should be his will, when completed and executed with all the further solemnities which were contemplated by him. In these cases the will is invalid unless completed within a reasonable time. But if he is prevented from completing the will in the intended form by the act of God, before he has a reasonable time for that purpose, and dies before another opportunity occurs, probate may be granted of the unfinished paper; such as a draft or instructions for the intended will.

The first case I have been able to find is *Strish* v. *Pelham*, (2 Vern. 647,) which belongs to the last class of cases. In 1686, the testator sent for a scrivener to make his will, who took it down in characters from his mouth, and it was read to and approved by the testator. The next day the scrivener brought the will properly drawn up for execution; but the *testator, who had then become insensible, died in that state; and it was holden a good will.

The anonymous case before the delegates in 1704, (cited in Com. Rep. 453,) is not stated with sufficient certainty to enable me to ascertain upon what principle it was decided.

The case of *Powell* v. *Beresford*, before the delegates, in 1707, (2 Ld. Raym. 1282,) belongs to the first class. The decedent wrote a testamentary paper, which on its face was declared to be his last will for fear of mortality, till he could settle it more at large; by which he gave a legacy for 1,000*l*. charged upon his real estate, and subscribed his name to the paper and gave it to the legatee. About a fortnight before his death, he declared he had left with the legatee unquestionable security for the 1,000*l*., which he had done for fear of mortality, until he could make a complete will, which he intended to do as soon as his wife was brought to bed. He died suddenly, two months after writing the will, while his wife was lying in; and it was admitted to probate.

The particulars of the case of *Wright* v. *Walthoe*, in 1710,

(Com. Rep. 452,) are not stated with sufficient certainty to enable me to understand the principle on which the decision was made. But *Warlich* v. *Pollett*, which came before the court of delegates the next year, (Com. 452,) clearly belongs to the last class of cases. It was an unexecuted will written *in extremis*, the execution of which was prevented by the death of the testatrix before the witnesses, who had been sent for, arrived. The case of *Brown and Heath* v. *Pocklington*, in 1721, (Com. Rep. 453,) was probably a case belonging to the same class with the last. From the loose statement of the case of *Loveday* v. *Claridge*, in 1730, (Com. 452,) it is impossible to determine to which class it properly belongs.

In the case of *Habberfield* v. *Browning*, in 1773, (4 Ves. 200, n,) the testatrix sent a letter of instructions to her attorney to draw up a will, but on the face of the paper it appeared that she intended the letter to operate as a will if she died before a formal will was drawn up, and for which further instructions were to be sent by her. She died a few months after the letter was sent, and before the will was drawn up. *The delegates pronounced in favor of the letter, as being intended as an absolute will if she died without making any other.

The case of *Cobbald* v. *Baas*, (4 Ves. jun. 201, note,) is one of those to which I have before alluded as exceptions to the general current of authority. It was decided in 1781, and is not therefore to be considered binding here, although it was for a time considered so in England. It bears a strong resemblance to the case now under consideration, except that the signature of the testator was there affixed to the will. It was a perfect will of real and personal estate, except that a blank was left for the day and month in the date. The usual attestation clause to wills of real estate was added, but there were no subscribing witnesses. The whole was in the handwriting of Savage, the testator. The judge of the prerogative court pronounced against this paper; but on appeal to the delegates, Sir W. H. Ashurst,

[*375]

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

Baron Hotham and Dr. Macham, it being a will both of real and personal property, they decided that it was *ren- dendo singula singulis* a perfect disposition of the personal estate; and they reversed the decision of the prerogative court.

Doctor Adams, in a note to *Beatty* v. *Beatty*, (1 Adams, Rep. 159,) says, the doctrine of the ecclesiastical courts from an early period, until the decision of the delegates in *Cobbald* v. *Baas*, respecting testamentary papers with attestation clauses, but not in fact witnessed, was that extrinsic evidence must be given to rebut the presumption of law against the will, and to show that the testator intended it to operate in its present state without being witnessed. That decision, however, for some time governed the courts of probate, averse as they were to consider it settled law. But after the decision of the court of review, in *Matthews* v. *Warner*, in 1799, they reverted without scruple to the old doctrine of those courts, which has uniformly been adhered to in subsequent instances. He also adds, "the judgment of the court of delegates in *Cobbald* v. *Baas*, is now held not to be law."

In *Griffin* v. *Griffin*, decided in 1790, where the decedent began a testamentary paper, but being called away to dinner, he locked it up, and nine days afterwards died suddenly, *the questions were whether this unfinished paper was a revocation of a former will, or whether it was to be established conjunctively with the former will. It was determined that the unfinished paper could have no effect. That the testator having lived eight days in health, without finishing it, the presumption of law was that he never meant to finish it. In reference to this case, Lord Loughborough says, "one great principle in the testamentary courts, as to imperfect papers is that if the testator declares an intention as to property, and has time afterwards to put that in writing, and does not, the presumption is, either he had not made up his mind, or that he had abandoned the intention." (5 Ves. 644.)

Again; in *Coles* v. *Trecothick*, (9 Ves. 249,) Lord Eldon

[*376]

says, " The observation is just, that, as to the personal estate, if it appears upon the will that something more is intended to be done, and the party was not arrested by sickness or death, that is not held a signature of the will which purports that there should be a further act."

In 1796, the Master of the Rolls thus expresses his dissatisfaction with the practice of the ecclesiastical courts which had then been adopted in consequence of the decision in *Cobbald* v. *Baas:* " I concur in the opinion dropped at the bar, that it is now almost absolutely necessary that the legislature should come to some regulation as to the forms necessary for wills of personal as well as real estate, from the habit the spiritual court has got into of granting probate of all the loose papers that can be found, and sending them to the Court of Chancery to be construed."

In 1798, this objectionable precedent was again followed by a court of delegates in the case of *Matthews* v. *Warner*, (4 Ves. 194,) in which case two unfinished testamentary papers, both in the handwriting of the testator, dated and signed with his name, were admitted to probate, notwithstanding the testator lived five or six years after their date ; but on an application to the king in council for a commission of review, the question was referred to the Lord Chancellor. In conformity to his opinion, a commission was issued to Beilby, bishop of London, Lord Kenyon, chief justice, and Lawrence, a junior justice of the court of King's Bench, McDonald, *chief baron of the Exchequer, Sir William Scott, judge of the court of admiralty, Rooke, one of the justices of the Common Pleas, and two doctors of the civil law. In November, 1799, this court, consisting of the most distinguished judges and civilians in England, reversed the decision of the delegate, and restored the testamentary law of that country as it existed both there and in this state at the commencement of our revolution.

The same year the case of *Stakes* v. *Percy* (cited 1 Meriv. 512, was decided upon the will of Mary Collett. She made her will of real and personal property, dated in 1796, all in

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

[*377]

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

her own handwriting, and subscribed her name, but did not seal it. An attestation clause was added, but it was not witnessed. She died suddenly three years after. The will was found locked in a chest of drawers, enclosed in a piece of paper, on which was written, in her own hand, " Mrs. Collett's will." And yet this testamentary paper was rejected." I presume upon the ground that she originally intended it to be executed in such a manner as to convey real estate as well as personal, which she had abundant leisure to have done; and that there was no evidence that she had altered that intention, or recognized it as her will of personal property only, *in extremis.*

So in *Hammond* v. *Hammond*, decided in 1801, (1 Meriv. 513,) a will of personal property only, made four years before the death of the testator, all in his own handwriting, but neither signed nor witnessed, was rejected. Then followed the case of *Wade* v. *Overton*, (1 Meriv. 513,) where the testator wrote a will of real and personal property commencing thus: "I, A. B., do make this my will, all in my own handwriting," &c. A seal was affixed to it, but it was signed only on the first sheet, and was not executed in the presence of witnesses. As all the personal property was mentioned in the first sheet, the legatees insisted that the signature was intended to apply to that species of property only; but the court held the will must be taken altogether, and construed as a whole. It was therefore disallowed.

The case of *Painter* v. *Painter*, decided in 1802, (Meriv. 512,) was on a will on real and personal property made [*378] *by an attorney, written with the testator's own hand. It was signed and sealed, and had a clause of attestation, but no witnesses. It was kept locked up with other papers of moment. He died suddenly, and this will was rejected.

In *Walker* v. *Walker*, in 1805, before a court of delegates composed of three common law judges and five doctors of the civil law, (1 Meriv. 503,) where the testatrix made a will of real and personal estate, and signed and sealed it, and a clause of attestation in the common form

was subjoined but not witnessed, and her will was found at the death in an envelope, on which was written, "I signed and sealed my will to have it ready to be witnessed the first opportunity I could get proper persons," it was decided the will was not good as to the personalty.

From several of these last cases it would appear that the prerogative court intended to adhere to the principle that a testamentary paper, purporting to dispose of both real and personal estate, if it is not on its face a perfect and finished will of personal estate, shall not, from any extrinsic circumstances, be presumed to have been intended by the testator to take effect as to that part of the property only, when it could not be made operative as to the whole.

In *Scott* v. *Rhoades*, in 1809, (1 Phil. Rep. 12,) a will of personal property only of Thomas Burchall, a clerk in the Bank of England, who resided by himself, found very much in the situation of the will under consideration, that is, with a blank for the day of the month, with an attestation clause and seal affixed, ready for execution, but not signed or witnessed, was admitted to probate, on the ground that its execution had been prevented by the act of God. But there it appeared on the face of the will that it had been written within a few days previous to his sudden and unexpected death; and there was other evidence from which it was inferred, that he actually intended to have executed it the very day on the morning of which he was found dead in his room. The language of Sir John Nichol in this case shows the strictness of the testamentary courts, where it is attempted to establish unfinished or unexecuted wills on the ground that the testator was prevented by the act of God from executing them with *all the formalities originally intended. He says: "My predecessors in this place have held the rule strict that the proof must show a continuance of intention, and that the deceased was prevented from completing the instrument by the act of God. It is my duty to tread in their steps, and to adhere to those principles which they have laid down. I am not at liberty to de-

[*379]

VOL. I. 27

1829.

The Public Administrator
v.
Watts and Le Roy.

Norton
v.
The Same.

part from them in any instance, if I were so inclined; but there is no point upon which I should be less inclined to do it than upon that now under consideration. I am strongly impressed with the necessity of applying the rule strictly and with firmness."

From the commencement of Phillimore's Reports, in 1809, to the present time, there is a regular series of reported cases in testamentary matters in England. Although I have carefully examined all those cases down to 1825, which have a bearing upon that now before me, I have found no material departure from the principles established in the previous adjudications. I shall therefore content myself with barely referring to such cases in their chronological order: *Sandford* v. *Vaughan*, (1 Phil. 48, 131;) *Green* v. *Skipworth*, (id. 53;) *Devereaux* v. *Bullock*, (id. 60;) *Bone* v. *Spear*, (id. 345;) *Wood* v. *Wood*, (id. 357;) *Carstairs* v. *Pottle*, (2 Phil. 30;) *Read* v. *Phillips*, (id. 122;) *Monro* v. *Coutts*, (1 Dow's P. C. 437;) *Huntington* v. *Huntington*, (2 Phil. 213;) *Sikes* v. *Snaith*, (id. 351;) *Satherthwaite* v. *Satherthwaite* ( 3 Phil. 1;) *Thomas* v. *Wall*; (id. 23;) *Musto* v. *Sutcliffe*, (id. 104;) *Lewis* v. *Lewis*, (id. 109;) *Friswell* v. *Moore*, (id. 135;) *Strauss* v. *Schmidt*, (id. 209;) *Buckle* v. *Buckle*, (id. 323;) *Boyle* v. *Maine*, (id. 504;) *Forbes* v. *Gordon*, (id. 614;) *Roose* v. *Moulsdale*, (1 Addams, 129;) *Beatty* v. *Beatty*, (id. 154;) *Pople* v. *Cunison*, (id. 377;) *Warburton* v. *Burrows*, (id. 383;) *Antrobus* v. *Nepeau*, (id. 399;) *Lavender* v. *Adams*, (id. 406;) *Doker* v. *Goff*, (2 Addams, 42;) *Montefiore* v. *Monteofire*, (id. 354;) *Allen* v. *Manning*, (id. 490.)

The few testamentary cases which appear in the reports of our own country, tend to confirm the principles of the decisions above referred to from the other side of the Atlantic. (2 Nott. & McCord, 531; 2 Marsh. Kentucky Rep. 71; 1 Serg. & Rawle, 263; 12 Mass. Rep. 534.)

[*380]          *In the case under consideration, the decedent was a lawyer and well understood what formalities were necessary to make a valid will. Possessing a large real and personal

estate, and without any natural relations, to whom either could descend in case of an intestacy, he had no object in making a will of the one without the other. Under such circumstances, twenty-seven years before his death, and while his bodily and mental powers were in full vigor, after providing for the support of the widow of his deceased brother, the only relative who had any particular claims upon his bounty, and giving a few pecuniary legacies to his executors and others, and to the church at which he worshipped, he determined to adopt the child of his old friend and fellow student as the heir to his overgrown property; and to bestow the whole on him, on condition that he changed his name, and assumed that of the decedent; intending, no doubt, that he should raise up a family to perpetuate the name of Leake. For this purpose he prepared the will in question, ready for execution; precisely as he would have prepared a similar instrument to be executed by a client. From the appearance of this paper there can be but little doubt that in the year 1800, when the will appears to have been written, Leake had fully made up his mind to dispose of his property in the manner indicated by that instrument. But the question here is not what he then intended, but what he actually did. Whatever may have been the cause why the will was not then executed, it is morally certain he did not at that time intend it should take effect, in its unfinished state, as a will of his personal estate merely; leaving his real estate, which at that time probably constituted the bulk of his property to escheat.

The inquiry is not, whether at any time since he prepared that will, he intended to die intestate, but whether at the time of preparing this paper, and at the time of his death, he intended to dispose of his property by that instrument in its imperfect and unfinished state. The respondents rely upon the fact, that Leake went to his iron chest about two weeks before his death, and took therefrom certain papers which he destroyed, and left this paper there, as evidence

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

that he intended it to operate as a will of his personal estate. But from *the testimony produced before the surrogate, it is extremely doubtful whether he saw it at that time. It was lying between the leaves of a field book, which he would not be likely to inspect on such an occasion. It may have laid there, unnoticed, ever since 1806, when the last memorandums appear to have been made in that book. If his attention had been called to this testamentary paper at a time when, with a view to his approaching dissolution, he was probably destroying mementos that affection had preserved, and which should not be left for the inspection of strangers, I think he would either have destroyed this paper also, or have left some memorandum thereon, showing what were his wishes in relation to its effect as a will of personal estate.

Although an actual signing of a testamentary paper may not be necessary to constitute a good will of personal property, yet the evidence of authenticity derived from the signature of the party is at this day so obvious, especially to a well informed lawyer, that surely he would not have hesitated to add such a proof of his recognition of the instrument. If a pen was to him a torpedo, as he declared in a letter to a friend, he would at least have risked one slight shock, and have filled in the date and put his name to the paper, with a note or memorandum that he wished it to operate as a bequest of his personal estate. It must be remembered that between the time when this will was prepared with so much care, and that when he last visited the depository of the evidences of his great wealth, which he had been hoarding up with such miserly care for so many years, circumstances had materially changed. Two of the executors named in the will had descended before him to the tomb, and the other two must probably soon follow; some of the legatees were dead, and he had survived James, the black man, one of the objects of his bounty, more than twenty years. The stock of the old United States Bank, the dividends of which were by the

will appropriated to the support of the widow of his de-
ceased brother, had been paid off, and the proceeds had
gone into the general mass of his property at least fifteen
years before his death.   The child of his friend, on whom
he had *once depended to perpetuate his family name, was
now a bachelor of forty, with no prospect of a change in
his situation.   And what is still more important, it is in
evidence from the mouth of Leake himself, that although
this principal legatee named in his will lived in the same
city, he had never visited the decedent, or been seen by
him since he was a boy and led there by his father.

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

With all this change of circumstances, if Leake, in the
last hour of his life, or at the time when he last visited the
iron chest, had been asked, do you intend thus to dispose
of your personal property by this will? to leave your
brother's widow unprovided for, the faithful Casey without
a shilling, and to let your immense real estate escheat to
the people of the state?   Is it possible to believe he would
have answered in the affirmative?   I cannot bring my
mind to the conclusion that he ever intended to separate
his personal property from the realty; or leave this instru-
ment, unexecuted, as the legal evidence of his final inten-
tions in respect to either.

Neither do I believe he intended to die intestate.   With
the counsel for the public administrator, I am inclined to
think he was doubting as to what disposition should be
made of the wealth which he could not carry with him;
probably hesitating between the son of his old friend, who
had disappointed him in the expectation of perpetuating
his name, and the relative of his step-mother, who, as he
expressed it, was "fiddling with his steam mill at the
south."   In this state of doubt and uncertainty, the slowly
wasting oil of life was at length exhausted; the lamp was
extinguished; and the laws of his country have written
his testament.

This question being disposed of, the next that arises is
which of the two appellants is entitled to letters of admin-

1829.

The Public
Administrator
v.
Watts and Le
Roy.

Norton
v.
The Same.

[*383]

istration on the estate? Without going into a detail of the evidence adduced by the appellant Norton to prove his relationship to the intestate, I am satisfied that the allegation by which he propounded his interest was wholly insufficient, and ought to have been rejected by the surrogate. Whenever a person comes forward to oppose probate of a will, he is bound to state his interest in the question with sufficient certainty to enable the court to decide whether, if the allegation *is sustained by proof, it will support his claim. He has no right to the administration, unless he has an interest in the estate as next of kin. Instead of showing how he is related to the intestate, agreeably to the ordinary form of allegations of interest, (*Lawrence* v. *Maud,* 1 Addams, 331,) he does not even allege that he believes he is the next of kin to the deceased. The next of kin of the decedent, whether alien or citizen, is entitled to his personal estate; therefore, being nearer of kin than any other person residing in the United States does not entitle him to the administration. If the next of kin is not here, or is legally disqualified from administering, the public administrator is entitled.

The surrogate having decided that the allegation of interest was sufficient to entitle Norton to be heard, it was correct that the evidence in relation to his interest, and that which related to the validity of the paper propounded as a will, were permitted to proceed *pari passu.* (*Waller and Smith* v. *Hesseltine and Burgh,* 1 Phil. 170.) But in looking into the testimony as to the interest of Norton, there is no pretence that he is the next of kin to John G. Leake. He was his relation by affinity, but not by consanguinity. John Leake of the Hermitage was the great uncle of John L. Norton; and the father of John G. Leake married a step-daughter of John Leake of the Hermitage. They were thus distantly related by marriage; and this accounts for all the declarations of the testator that Norton was his relative.

There must be a decree entered on these appeals, revers-

ing the sentence and decree of the surrogate of New York in favor of the paper propounded as the last will of John G. Leake, and granting probate thereof. It must also be declared and decreed that the decedent died intestate; that John L. Norton, the appellant, is not his next of kin, is not interested in his personal estate, and is not entitled to administration; but that the public administrator of the city of New York is entitled to letters of administration on the estate. And this cause must be remitted back to the Surrogate's Court, with directions to call in the letters of administration (*ad collegendum*) heretofore granted, and to grant administration to the public administrator.[1]

[1] All doubt on the subject of subscribing and attesting wills are removed by statute. See R. S. (4th ed.) 246, sec. 33.

1. The statutes require that the testator must subscribe his name at the end of the will. 2. Such subscription must be made in the presence of each of the attesting witnesses, or acknowledged by the testator to have been so made, to each of the witnesses. 3. The testator, at the time of making such subscription, or at the time of acknowledging the same, shall declare the instrument so subscribed, to be his last will and testament. 4. There must be at least two subscribing witnesses, each of whom shall sign his name at the end of the will, at the request of the testator. See also *Brinckerhoof* v. *Remsen*, 8 Paige, 491; *Chaffee* v. *Baptist Missionary Convention*, 10 Paige, 86; *Nelson* v. *McGriffert*, 3 Barb. Ch. 158; *Rutherford* v. *Rutherford*, 1 Denio, 35; *Tonnele* v. *Hall*, 4 Comst. 140.